open according to law. God save the United States and this honorable court. Good morning, everyone. Welcome to this virtual session of the U.S. Court of Appeals for the Fifth Circuit. Forgive my robeless state. We were in a rush to get from New Orleans back home to Austin last night before the inclement weather hit. And I am in my in my rush to leave. I left my robe in my closet. So forgive my less than official appearance. But we're going to get started this morning on the first case. Twenty one dash three double 0 2 8 U.S. v. E.R.R. And Mr. Hassinger, take it away. Thank you, Judge. Good morning and may it please the court. Tim Hassinger for the appellants in this case. Judge, in your honors, after over five years and now a trial, the government still has not established how oil was discharged from the E.R.R. facility into the Mississippi River. The original theory by the government to give some background, which I think is helpful, was that E.R.R. simply overran their treatment tanks and and accidentally discharged oil into the river. That was the theory for years. But years later and only after they filed this lawsuit did the government finally realize, well, that couldn't happen and it couldn't happen because if oily water actually runs through the E.R.R. tanks, it comes out clean as part of the normal treatment process. Essentially, if it goes in, it gets treated and gets cleaned as a result. So again, that wasn't discovered until they filed the lawsuit and actually did further investigation. So then years later and only after the lawsuit was filed, the government retained an expert in 2019, 2020, and then they developed a new theory that someone must have bypassed our entire facility, must have run hoses along the ground, and must have intentionally essentially discharged into the river. Even their expert, however, as he testified at trial, cannot say more likely than not that that happened. Instead, he only says, well, it's possible. And never once as part of this the barge, which was actually owned and operated by another company, the barge that actually had the oil, the barge that was in the water and was discharging the oil to begin with, the same tug and barge whose captain actually observed a discoloration in the water off the port stern of the barge that night and a captain who never notified the Coast Guard, the National Response Center, or anyone else. So after five years and they're changing theories of the case, the government's presentation to the court at trial was, well, it was possible that someone bypassed the treatment facility, not probable, not more likely than not it was possible, and that it was essentially possible for two local individuals, my clients from the New Orleans area who developed this treatment, this proprietary treatment system, this process for cleaning wastewater who literally built this facility in Belchase, Louisiana along the river, a facility that is a small facility that if you were traveling along the highway on the other side of the levee, you wouldn't even know it was there, that they didn't accidentally discharge oil because, well, we found out that can't happen because it would have to be cleaned. They intentionally discharged it. So again, that it was possible, not probable, but possible somehow in some way. So we presented to the court and we appreciate the opportunity to argue orally in this particular case three issues for appeal, and we think they're important issues. First, under the plain language of the Oil Pollution Act, there must be a showing that oil was discharged from a facility and into navigable waters. Those aren't words that we created. They're words that are actually in the statute, and if you look at the case law interpreting it, they have to show the government does five things, that the defendant's a responsible party, two, for the facility or vessel, three, from which the oil was discharged, four, into or upon navigable waters, and that the discharge resulted in removal costs as a result. And the first problem we have is that the government presented no evidence, much less a preponderance of the evidence to establish those five factors, that the defendants actually discharged oil from our facility and into the river. Essentially, they established no pathway, and it's frustrating for me because I was actually out at the facility back in 2016 and have been living with this case for many years, and no one has established how oil actually got from my client's treatment facility that they created into the Mississippi River. In fact, the Coast Guard, again, it's important factually, had investigators on scene the following morning. Those investigators didn't identify any path of discharge or any bypass that was going on. Before the Coast Guard even arrived, the Louisiana DEQ had actually been on the scene before the Coast Guard that morning. They didn't identify any path of discharge or bypass of the ERR facility either. And then after examining extensive documentation in the case, doing a site inspection, the government did, which I was present for as well, the government's expert that they retained after the lawsuit was filed, Mr. Amendola, Amendola could only offer an opinion that someone could have bypassed the treatment facility and intentionally discharged into the river. There wasn't a single photograph taken by anyone identifying the path of discharge from the facility into the river as a statute requires. The Coast Guard actually did an aerial flyover the morning after while they had Coast Guard officers and investigators on scene, and they took one photograph. They did a flyover up and down the river. They did a flyover by facility, and they took one photograph. That photograph doesn't show any hoses running along the ground or doesn't show any bypass of the facility into the river. So with no evidence, admissible evidence, establishing the pathway, the government was forced to argue that, well, we don't have to show a pathway. We can just show that there was some oil that was in your tank that matched what was in the river. But what that ignores, of course, is that, well, the oil that was in the barge is the same oil, and that's the one that was never tested. And the barge was literally in the water before anything was ever discharged to our facility. So our first point on appeal is really statutory interpretation. And if you look at the plain language of the statute, it requires from and into, and that hasn't been established here. We also cited to your honors the recent Supreme Court case, the County of Maui case, where Justice Breyer discusses some statutory interpretation in the context of another statute, but we think it's important for the statutory interpretation in this case. And as the Supreme Court held, when you're dealing with language like this, it necessarily requires that you draw the context for the particular language. What's the context of the language? And also, in our view, what's the plain language of the statute mean? And if you look at the briefing that we've submitted, just the ordinary dictionary definition, for example, of from means you have to have some type of starting point and some type of physical movement. And then if you look at the into, that's a function word as well, and it has to show some type of entry into something. So if we apply those terms in the context of, as the Supreme Court has dictated, in the context of this particular statute, it requires, just in the plain reading of it, that they have to show a discharge from our facility and into the river, and they were not able to do that, and no one has been able to do that. So to hold otherwise, in our view, would essentially be effectively rewriting the terms of the statute, which simply isn't permissible. The second issue that we've raised on appeal for the court to consider is the issue regarding our right to a jury trial. As Judge Fallon, who we have a great respect for, wrote in striking our jury, it's undecided, and this court hasn't decided it yet, so what he was going to do was to seat an advisory jury so that he had that protection and that precaution and someone to actually advise him on the case so we could actually try the case before a jury. As we all know, there have been delays with courts and trials because of the pandemic, so what happened in this case, we filed an opposition to any striking of our jury. The judge decided, well, just because it's uncertain, it's unclear, I'll seat an advisory jury. Well, there were further delays with COVID, inability to get jury trials going, so the judge, Sue Esponte, decided that, well, we're going to get this case tried and I'm going to no less by Zoom. If you look at the case law and what we think is the standard for this type of a case, it was improper for the court to strike our jury in this particular setting. You typically are going to look under the toll factors, for example, at the nature of the remedy and also the nature of the cause of action, so what was the remedy here? It wasn't an equitable remedy for which there should be a non-jury trial. An equitable remedy, in my view, would be something along the lines of my clients are holding something that they shouldn't have and the government is seeking return of that thing. That may be an equitable remedy or maybe there's an injunction being sought, for example, something where we're wrongfully doing something and they want to stop us, so they want something to be returned, but generally, when you have an action for money damages, as in this case, that's a legal remedy where we should not lose our right to a jury trial and we especially shouldn't lose it in the context of, well, we can't wait another month for us to try the case by jury or we can't wait another two months. We're just going to get this case tried now. Our constitutional right and protection of a right to a trial by jury should never be outweighed by a delay, whether short or not, due to the pandemic. The second issue is the nature of the cause of action and it's something, in our view, that the district court didn't address. The federal government is asserting a cause of action for removal costs under OPA and also it asserted, which is very important in this case, a subrogation right as well, which again is a legal remedy to which we have a right to a trial by jury. They weren't seeking incidental or injunctive relief. They sought a money judgment and actually obtained a money judgment from us of over $600,000 along with costs and prejudgment in interest and attorney's fees and the basis for its claim is the allegation that we're the responsible party for an oil spill and that we should be required to pay all these damages that they ultimately pay. There's a right to a jury trial for those types of claims, especially when we're about a claim that has been brought by the federal government in subrogation. And then finally, the third issue is the amount of damages that were awarded. We have a spill in this case that was less than 400 gallons. It was not a large spill by any means. The oil spill contractor to whom or with which we didn't contract ultimately charged over $630,000. They had people out there ranging from six people to 36 on a given day, again, for a small spill. The NPFC has a fiduciary obligation to the oil spill liability trust fund and the testimony and evidence that was presented to the district court is that who was the lead claims manager on behalf of the government really didn't scrutinize any of these charges. She essentially compared the work that oil mop did to their schedule of charges, but there was no further scrutiny that was paid. And when we're talking about taxpayer funds and the fiduciary obligations that go along with this, we believe as a matter of law and as a matter of fact that more is required than simply reviewing what a vendor has submitted. You have a bid from someone who would do it for less money? Your Honor, that's a great question. And the short answer is I don't know because we weren't part of that process. But what we did do, because we didn't, for example, we don't know whether there are any other bids that were submitted to the federal government for the work. You could have cleaned it up yourself, you know. Your company could have cleaned it up. Your Honor, based on the dynamics of what was going on at the time and the logistics of what was going on at the time, that was for a responsible party to clean up at that moment. And our clients were confident and still are that there was no oil that was discharged from our facility based on the particular circumstances and the facts on the ground at that moment in time. So what we did for trial is we retained an expert who actually scrutinized the bills and the invoices and offered testimony that what was charged was over 10 times more than what should have been charged in this particular case. So we have two important issues as a matter of precedent. One, which we think is statutory interpretation. Second, we have a jury trial issue, which is a very important issue to us and also should be an important issue within the circuit as to our ultimately were awarded in this case. And under the circumstances, we would ask that the judgment of the district court be reversed and that there be a finding and a holding of this court that the government did not establish a discharge from our facility and into the river as a statute requires. Or alternatively, that the judgment of the district court be reversed and remanded for a trial by jury, which we were entitled to all along. Or third, alternatively, that the damages be to a more reasonable sum in accordance with the evidence that was submitted at trial. Torontos, can I reserve my remaining time for rebuttal if it's necessary? You've reserved five minutes for rebuttal. We appreciate that and we'll see you back in a few minutes. And now we'll hear from counsel for the appellee, the United States. Thank you, Judge Willett. Good morning and may it please the court. My name is Anna Katzelas and I'm here on behalf of the United States. This is a straightforward Oil Pollution Act cost recovery action. By way of brief background in 2015, a discharge of oil from ER's oily wastewater treatment facility into the Mississippi River necessitated a 23-day removal action. That action was performed by ERR's pre-designated oil spill response contractor. And despite approving its contractor's daily service tickets on each of those 23 days, ERR subsequently refused to pay its contractor for any of its work, forcing the National Pollution Fund Center or NPFC to foot that bill. The United States then brought this action to recover its costs and establish both ERR's liability and the reasonableness of the amount paid by clear and overwhelming evidence at trial. The record is clear that ER failed to rebut the voluminous evidence against it and its arguments on appeal find no support in the record or the law. And the district court's judgment should accordingly be affirmed. ERR's primary argument on appeal is that the United States failed to prove the precise pathway the oil traveled from its facility to the river and consequently failed to prove that the oil was discharged from its facility within the meaning of 33 U.S.C. 2702A. ERR is wrong that the statute requires such proof, but the court need not reach that issue because the record is clear that the United States did prove the pathway the oil traveled. It traveled directly from ERR's discharge pipe into the Mississippi River. And respectfully, your honors, the U.S. Exhibit 1, which is in tab 3 of our excerpts, is the aerial photograph taken the morning after when the Coast Guard first arrived on the scene, and it tells the story. There's a plume directly above the end point of ERR's discharge pipe. And the United States produced a lot of additional evidence to support this as well. And, you know, briefly, to the point that the United States was inconsistent, that finds no support in the record at all. You know, the United States Coast Guard arrived on the scene the morning after it received these reports that oil had been discharged, and throughout the course of investigation, it became clear what had happened, that ERR had bypassed its treatment process and discharged this directly into the river. So at bottom, ERR's complaint is really with the United States unquestionably permissible use of circumstantial evidence to establish this fact, and ultimately with the district court's weighing of the evidence, which is rooted in the court's credibility determinations. This is reviewed under an especially deferential, clearly erroneous standard. Especially viewed through its proper lens, ERR has identified no reversible error. The United States presented substantial evidence that the oil traveled through ERR's underwater discharge pipe, and if I could briefly outline that evidence, there's evidence that the oil in the river chemically matched only the oil in ERR's discharge pipe. That the facility's discharge pipe travels in a straight line from the facility's storage tanks into the river. That the facility accepted nearly twice as much oily wastewater as it had the capacity to store in the months prior to the spill. That ERR had sole control over the discharge pipe, as well as hoses and pumps, which could be used to bypass the system and connect the receiving tank, or tank number two, directly to the discharge pipe. That the pipe lacked a required flow measuring device, this is significant, which allowed unpermitted discharges to be made without detection. And that a plume of oil was observed in the vicinity and directly above the discharge pipe's endpoint the morning after the facility accepted a large transfer of oily wastewater from a barge. So respectfully, your honors, there really is, no need to reach the statutory interpretation issue that ERR has presented, because the evidence is clear that this is what happened. But if the court concludes that the United States did not prove the pathway the oil traveled, the district court's judgment should still be affirmed, because OPA plainly does not require such proof. The statutory language from which relates directly back to a place, the facility, such that the United States was required to prove that the oil in the river was discharged from ERR's facility, which includes not only the discharge pipe, but also a number of tanks, including tank number two, pipes, and other equipment into the river. The United States did so. ERR relies primarily on County of Maui in arguing to the contrary, but that case does not support its position, and in fact supports the United States position. In County of Maui, the Supreme Court held that the Clean Water Act's permit requirement is not limited to direct discharges of pollutants from point sources to navigable waters, but also includes the functional equivalence of such discharges, where the pollutant travels through something other than a point source after it leaves one point source before it reaches navigable waters, and groundwater was that in the case. The court identified a number of factors that may be relevant in determining whether an indirect discharge is the functional equivalent of a direct discharge in those circumstances, such as the distance traveled and the time it took, but this is not a Clean Water Act case. OPA imposes liability from discharges from facilities, a substantially broader term than point source, and this is not an indirect discharge case. The evidence at trial overwhelmingly established that ERR's facility discharges directly into the Mississippi River via its discharge pipe, and significantly, the Supreme Court squarely of conveyance. Instead, the court held that it has its common meaning of a source or origin. OPA is similar to the Clean Water Act provision addressed in Maui in that it couples the word from with the common words into or upon, which strongly suggests that the word from in OPA likewise simply refers to an origin or source and not a pathway or means. Accordingly, it is evident that the source of the oil in the river was ERR's facility, which it unquestionably did. It's evident that the source of this was the oil in its tank number two. The United States did not have to prove the pathway within ERR's facility, which is essentially what they're arguing, or the pathway from the facility into the river. It's enough that ERR's facility is the source of the pollution. Counsel, can we talk about your Seventh Amendment, or your response to the Seventh Amendment argument? And help me understand how I see the argument in your brief that the remedy sought here is in the nature of equitable restitution. Your friend on the other side argues forcefully that it is more like restitution at law. I take it that the United States has a distinction between the two different forms of restitution, one at equity and one at common law? Well, Your Honor, yes. ERR is relying on the decision NUBSN for this principle, which did recognize that there is legal restitution and there is equitable restitution. So for equitable restitution, the defendant has some form of property that either belongs to the plaintiff or that the defendant otherwise is wrongfully possessing. Respectfully, Your Honor, no. And if I could just briefly state that NUBSN is not a Seventh Amendment case. It doesn't address environmental cleanup costs. And it's a decision that was decided 20 years ago. And to our knowledge, no court has followed it or held or felt that found it significant for whether environmental cleanup costs are equitable claims for equitable cleanup for recovery are equitable or legal. But respectfully, Your Honor, I disagree because, you know, the root of this is to prevent ERR's unjust enrichment. That is what is happening here. You know, the ERR would be unjustly enriched if it did not pay for the cost of this cleanup. The amount of money that the United States is seeking from ERR has zero relationship to their unjust enrichment. As I understand the claim that's submitted to ERR, it's 100 percent. Obviously, you're adding stuff to it, but the base of it is the amount that the United States spent to clean up the oil. So it has nothing. If you sued them perhaps for profits or whatever, you sued them because they unjustly skirted the protection, you know, spending money to, you know, line their tanks or prevent the spill and that they had unjustly profited from sort of, you know, cutting corners in that way, maybe. But that's not the claim that the United States brought against them. Well, it's significant, Your Honor. Respectfully, this is the point of this seeking its cleanup costs is to restore the status quo. And that is really the heart of why this is an equitable claim and why the avalanche of authority in the CERCLA context for analogous cost recovery actions, both direct actions and contribution actions, are recognized as equitable claims. Restitution always, like the purpose, whether it's restitution at law or restitution at equity, the purpose of restitution is always to restore the status quo. The only question is, is it a legal remedy or an equitable remedy? And the thing that I'm still not understanding is how it can be an equitable remedy in your view if you're not actually seeking something the ERR either possesses that belongs to you or wrongfully possesses and belongs to somebody else. Well, Your Honor, I think in the equitable, you know, so the analysis looks at both the the status quo and that is what is significant and that is what numerous courts have recognized as being significant in these cases. I think what ERR is really advocating is a very technical distinction. You know, I think there's no question if, you know, in the United States, direct action, you know, for its cost that this is equitable. And so ERR is suggesting that it's somehow different, that the subrogation makes it different, but it doesn't. And, you know, subrogation and contribution are really very similar and they've been recognized as such. Courts have recognized the similarity between subrogation and contribution. And so I think what's significant there is that the courts have overwhelmingly recognized, you know, that in CERCLA, it's not just 107, CERCLA section 107 actions, but also CERCLA contribution actions under 113F1, which are equitable. And again, Your Honor, it's, you know, I take your point that there has been, you know, in a very different context, in this Knudsen case in the Supreme Court recognized a distinction between legal and equitable. But at bottom here, it doesn't matter. It's a technical distinction that ERR is advocating. The United States should not have had to pay for this cleanup. It's ERR's responsibility. But why shouldn't the Knudsen explanation of the distinction between legal and equitable restitution control here? Well, I think it's, you know, it's significant, Your Honor, in that no court, again, that we are aware of in 20 years since it has been decided, has found that it controls, you know, in Knudsen, the court was addressing a very, it found a very different claim was legal. You know, the case, the question in that case was whether a provision of ERISA authorizing equitable relief authorized an action by an employer's health plan to recover amounts paid to an employee for medical expenses. And so I take that. But I do also see that Justice Scalia relied on Dobbs very heavily. In fact, it's almost a direct quote, the test for legal and equitable. And Dobbs is a discussion of general application. He also relied on the rest of the restatement for support of that. And it certainly is more general application. So I don't quite understand why the fact that this was not a police pollution cleanup case would make any difference. Well, Your Honor, I think it's it, it's significant, again, that the cases that have analyzed that what the nature of this claim and the and the remedy sought have, you know, overwhelmingly concluded that this is equitable. If I could also address another point, you know, I think to the extent ER suggests that money is always legal, that's plainly, plainly not true. In the chauffeurs case that they rely on chauffeurs, teamsters and helpers, for example, the Supreme Court made that very clear. And it distinguished between that, you know, a claim against a union for back pay, which it found to be legal and claims against employers for back pay under Title 7, which it assumed for purposes of the decision were equitable and which had uniformly been held to be equitable. So this is, you know, when you look at the so even respectfully, Your Honor, I think it is significant that courts have not interpreted Knudsen as having any, you know, for or suggesting that environmental cleanup cost cases are are legal, but also the nature of the claim that was that was at issue in that case and the nature of claims that are at issue here that are that in some of these cases are very different. I'm still hung up on the same thing that Judge Davis is asking you about, and I'm not hearing an answer because it's true Knudsen is an ERISA case and this is not. But Knudsen is an interpretation of the Seventh Amendment to the Constitution, which applies here as it does, you know, in whether it's under the OPA or CERCLA or ERISA or some other statute. So it sets forth a generally applicable test that has two parts and how we're supposed to determine whether the particular claim asserted is one that is at law or at equity. And the fact that that one arose under ERISA strikes me as neither here nor there. It's not like Justice Scalia said for ERISA purposes the Seventh Amendment means X. He said the Seventh Amendment means X. And so and I take it, you know, relatedly that your principal case that you rely on the brief, this HATCO case from the Third Circuit predates Knudsen by by seven years. So obviously it has nothing to do with Knudsen, doesn't interpret Knudsen, doesn't grapple with Knudsen because Knudsen was but a twinkle in the eye of the Supreme Court in 1995. So help me understand if you can just grapple with the merits of how the court interprets the Seventh Amendment and why that would somehow not entitle the ERR company to a jury trial. Well respectfully, Your Honor, Knudsen is not a Seventh Amendment case. It wasn't at issue. It's it the question it was a statutory interpretation question of whether a provision of ERISA authorizing equitable relief authorized this action. Sorry I apologize I misspoke. What I what I meant to say was that it's grappling with the same question that we have to deal with in the Seventh Amendment context which is this question about law and equity that as to whether the jury trial is triggered. I'm sorry I apologize for misspeaking but you you get the thrust of the question which is it's not like Justice Scalia is is cabining this somehow to the text of ERISA. It's a question about what actions are at equity and which ones are at law. Correct, Your Honor, and and respectfully even even even recognizing that and looking at Knudsen the holding doesn't have any I mean at bottom what you know and what these what the cases are looking at is at bottom you know would this case have would this case have been tried by a chancellor and or decided by a chancellor in equity in 18th century England or a court of law and these cases that are the principle is unjust enrichment and respectfully it's not limited it can't it it's not limited to somebody wrongfully holding one's own property it's it's it's for return of property or the proceeds thereof it is to restore the status quo here it's about you know the United States paid to clean up you know ERR's you know pollution and this is at its bottom it is an to prevent the unjust enrichment that ERR would have if it got to keep it got to not pay for this and it makes no functional. Can I ask you a hypothetical? Suppose my neighbor's tree falls on my side of the property line and I have to clean it up and I'm gonna sue my neighbor it cost me a hundred dollars to clean it up so I'm gonna sue my neighbor for a hundred dollars is my action at law or equity? That's your honor I'd have to think about that a little more but it sounds like a it sounds like an equitable action. Really I'm suing you in equity for a hundred dollars and what would be the theory what would be the claim that I'm bringing against my neighbor? I'm not I mean that would be a negligence claim your honor I'm not sure about I'm not sure about the answer to that to that question but I think you know it's in this case as we've as we've you know explained many courts have looked at this many courts have analyzed the history and these kinds of claims were not held were not decided by courts of law and again in Knudsen the legal restitution that judge that the court was you know was looking at and considered was very different from this claim. It was you know a claim by a health plan to recoup you know benefits it had paid for medical expenses that really sounds in contract and it's considerably you know it's very different from what is at heart in environmental response cost claims which are at bottom in equity it is the principle that the polluter pays. All right counsel thank you very much we appreciate it. Mr. Hassinger you've reserved five minutes for rebuttal so whenever you're ready. Thank you judge I'll have much less just just a couple of points there there was nothing showing that we were unjustly enriched by anything at all there's no record evidence of that and and the fact of the matter is we weren't second and respectfully there's really no explanation for why this would ever be an equitable claim and not only are they asserting the claim for the cleanup costs and damages but they've asserted a statutory a segregation claim which is an action at law and not equity as well we should have been entitled to a jury trial and to try this case before a jury based on the nature of the claims that the government was asserting and COVID and delays with the pandemic or or something that never should outweigh the constitutional right that we have for a jury to actually have heard this case so we again we respectfully pray as we have in our brief and as I as I prayed before for for judgment accordingly all right thank you both very much we appreciate also you know we converted this case over to zoom at the relatively last minute so thank you both for being flexible and and nimble with us we appreciate that thank you very much thanks all right the case is submitted thank you thank you